| | | |
|---|---|---|
| **LABARRON MCCLENDON** | * | **NO. 2023-CA-0531** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **SEWERAGE & WATER** | * | |
| **BOARD OF NEW ORLEANS** | | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

\* \* \* \* \* \* \*

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9386
Honorable Jay Ginsburg, Hearing Examiner
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*
(Court composed of Judge Joy Cossich Lobrano, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)

Jessica M. Vasquez
400 Poydras Street, Suite 900
New Orleans, LA 70130

COUNSEL FOR PLAINTIFF/APPELLANT

Ashley Ian Smith, Assistant Special Counsel
Darryl Harrison, Deputy Special Counsel
Yolanda T. Grinstead, Special Counsel
SEWERAGE AND WATER BOARD OF NEW ORLEANS
625 St. Joseph Street, Room 201
New Orleans, LA 70165

COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
**APRIL 5, 2024**

DNA

JCL

TGC

This is a city civil service matter. Appellant, LaBarron McClendon ("Mr. McClendon"), seeks review of the May 11, 2023 decision issued by the Civil Service Commission of the City of New Orleans ("Commission"),[1] which found that Mr. McClendon never met the minimum qualifications for his position as Utility Human Resources Administrator ("UHRA") while working for Appellee, the Sewerage and Water Board of New Orleans ("SWBNO"), and was thus never made a permanent employee.[2] The Commission further concluded that because

---

[1] We take judicial notice of the website of the City of New Orleans regarding the structure of the City's civil service. *See Gniady v. Ochsner Clinic Found.*, 2023-0215, p. 3 (La. App. 4 Cir. 12/28/23), ___ So.3d ___, ___, n.3, 2023 WL 8946265, at *2 (citing *Del Vescovo v. Air & Liquid Sys. Corp.*, 2023-0116, p. 10 (La. App. 4 Cir. 11/15/23), 377 So.3d 759, 768 n.7, 2023 WL 7638681, at *5 (holding that "[t]his Court can take judicial notice of government websites")). The New Orleans Civil Service is divided into two parts, namely the Civil Service Department and the Civil Service Commission. *The Civil Service Commission*, CIVIL SERVICE DEPARTMENT (last updated Feb. 20, 2024, 3:31 PM), https://nola.gov/next/civil-service/topics/commission/. According to the City's website, "[t]he Civil Service Department is a constitutionally created entity" that "*is responsible for the overall administration of the personnel function in City government.*" *Id.* Though the Civil Service Commission is also a constitutionally created entity, it "*is the policy-making body that exercises oversight of activities of the Civil Service Department.*" *Id.* The Civil Service Commission "is a quasi-judicial body with power to make rules which have the force and effect of law." In that capacity, it "serves as the court of first instance for all employee appeals resulting from disciplinary actions." *Id.*

[2] The Civil Service Rules for the City of New Orleans ("Civil Service Rules") do not use the phrase "permanent employee" but rather use the phrase

1

only permanent civil service employees have a right to appeal to the Commission, Mr. McClendon had no right of appeal to the Commission regarding his termination from SWBNO, and the Commission dismissed his appeal accordingly. For the following reasons, we affirm the Commission's decision.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On or about July 4, 2019, Mr. McClendon applied for the UHRA position with SWBNO on the public website Indeed.com.[3] The UHRA position required a one-year working test or probationary period.[4] Sometime in November 2019, SWBNO offered the UHRA position to Mr. McClendon; and he accepted and began working for SWBNO.[5] The following year, on July 28, 2020, SWBNO sought to reallocate Mr. McClendon to a higher classification,[6] at which time the

---

"regular employee," which is defined as "an employee who has been appointed to a position in the classified service in accordance with the Law and these Rules and who has completed the working test period." Civil Service Rule I, § 1(64).

[3] The record does not specify on what date Mr. McClendon applied for the UHRA position. The job posting lists an opening date of July 3, 2019, and a closing date of August 9, 2019, at 12:00 a.m. During his testimony at the hearing of this matter, Mr. McClendon recalled applying for the position "around . . . Fourth of July."

[4] Throughout the record and in this Opinion, the phrases "working test period" and "probationary period" are used interchangeable as they are in the Civil Service Rules. *See* Civil Service Rule 1, § 1(81) (stating that "[t]he terms 'probation period' and 'probationary employee' shall be considered identical with 'working test period' and 'working test employee'.").

[5] In his brief to this Court, Mr. McClendon contends that SWBNO hired him on November 6, 2019, but SWBNO states in its brief that it hired Mr. McClendon on November 18, 2019.

[6] In particular, SWBNO sought "to reallocate the UHRA classification to the Utilities Senior Services Administrator classification to appropriately align the rate of pay and appropriate pay range, with the current duties and responsibilities of SWBNO's Human Resources Department with [Mr. McClendon's] skills, abilities, education and experience."

Civil Service Department[7] notified SWBNO that Mr. McClendon had not met the minimum qualifications for his present UHRA position, namely Mr. McClendon had not obtained a professional human resources certification.[8] Thereafter, SWBNO transferred Mr. McClendon to "transient" status and then to "provisional" status to afford him more time to obtain the professional certification. Mr. McClendon did not obtain the professional certification during this time.[9]

Ultimately, on June 30, 2022, the Director of Personnel for the Civil Service Department, Amy Trepagnier ("Ms. Trepagnier"), informed SWBNO that Mr. McClendon had failed to satisfy the minimum qualifications for the UHRA position because he did not obtain a professional certification in human resources management and, accordingly, needed to be terminated or demoted. In particular, in her June 30, 2022 letter, Ms. Trepagnier quoted a note from the UHRA job posting regarding professional certification, which is discussed more fully throughout this Opinion. In a letter dated July 5, 2022, the Executive Director of SWBNO, Ghassan Korban ("Mr. Korban"), notified Mr. McClendon of his

---

[7] This Opinion will refer to the Civil Service Department by its full name so that it is not confused with any other use herein of the word "department."

[8] Specifically, in response to SWBNO's request to upgrade the UHRA position, Robert Hagmann, Personnel Administrator for the Civil Service Department, sent an email on August 6, 2020, in which he stated:

> Finally, as part of the minimum qualifications for the UHRA, Mr. McClendon was required to obtain a related Professional Certification . . . . The certification designation was not listed on his resume. If Mr. McClendon has received his certification, please provide a copy of the certification so we can make a determination that he has met all the minimum qualification requirements for his position.

[9] According to the record, Mr. McClendon attempted to obtain the certification on two occasions but did not meet the requirements to pass.

forthcoming termination. In the July 5, 2022 letter, Mr. Korban stated, in pertinent part:

> The [UHRA] position had a one-year probationary period during which time you were required to obtain "a related professional certification in human resources management such as a SHRM-SCP or SPHR.[10]" Failure to obtain the required certification would result in the failure to pass your working test period and termination.

---

[10] Louisiana Code of Evidence Article 201 pertains to "Judicial notice of adjudicative facts generally." It provides, in pertinent part:

> **B. Kind of facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either:
>
> (1) Generally known within the territorial jurisdiction of the trial court; or
>
> (2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> **C. When discretionary.** A court may take judicial notice, whether requested or not.

In interpreting La. C.E. art. 201, the Louisiana First Circuit Court of Appeal has explained that "[a] court is authorized to take judicial notice of an undisputed fact that is capable of accurate and ready determination." *Bridges v. Bridges*, 2020-0300, p. 16 (La. App. 1 Cir. 11/10/20), 316 So.3d 17, 28 (citing La. C.E. art. 201(B)). Judicial notice constitutes "a method by which courts dispense with formal proof when there is no real necessity for it because the facts noticed are indisputable as a matter of notorious common knowledge or as being easily capable of immediate verification." *Id.* (citing *S.J. Lemoine, Inc. v. St. Landry Par. Sch. Bd.*, 527 So.2d 1150, 1153 (La. App. 3d Cir. 1988)).

In the appeal before this Court, Mr. McClendon and SWBNO do not dispute what the acronyms "SHRM-SCP" and "SPHR" stand for, but nowhere in the record are these acronyms fully written out. At the March 23, 2023 hearing in this matter, counsel for SWBNO stated, "I believe [SHRM] is the Society of Human Resources Management." Neither party has asked this Court to take judicial notice of what the acronyms represent, but we have determined that the meaning of these acronyms represents a fact that is "easily capable of immediate verification." Thus, in light of La. C.E. art. 201 and the foregoing jurisprudence, we take judicial notice that SHRM-SCP stands for "Society for Human Resource Management-Senior Certified Professional" and that SPHR stands for "Senior Professional in Human Resources." *See* SHRM-SCP: SENIOR CERTIFIED PROFESSIONAL, https://www.shrm.org/credentials/certification/shrm-scp (last visited Feb. 23, 2024); CERTIFICATIONS: SENIOR PROFESSIONAL IN HUMAN RESOURCES,

Unfortunately, as of June 30, 2022, more than two and one-half years after your hire, you have failed to obtain the required professional certification. Thus, you are deemed to have failed your working test-period resulting in the determination that you lack the requisite qualifications of the position and your services are no longer required by the agency. This action is necessary for [SWBNO] to maintain the standards of effective service and is in accordance with the following applicable rules and policies.

The letter then quoted Civil Service Rule IX, § 1.1(a) regarding "Disciplinary Actions, Maintaining Standards of Service," Civil Service Rule VII, § 1.1 titled "Working Tests, Employees to Serve," and SWBNO's probation period policy. The letter stated that Mr. McClendon's termination would be effective on July 22, 2022.

#### **Disciplinary Appeal Form Filed with the Commission**

After his termination, on July 23, 2022, Mr. McClendon filed a "Disciplinary Appeal Form" with the Commission. On the Disciplinary Appeal Form, Mr. McClendon listed the "Nature of Discipline Imposed" as termination; dismissed (fired); and "[f]ailure to [p]romote [o]ut of [p]osition or [d]emote out of [p]osition." In support of his appeal, Mr. McClendon included a narrative with his Disciplinary Appeal Form, wherein he contended that the job posting for the UHRA position "contained contradictory language" regarding whether a professional human resources certification was required for the position. Mr. McClendon attached the job positing as an exhibit, and it stated, in pertinent part:

**MINIMUM QUALIFICATIONS:**

1. Bachelor's degree from an accredited college or university in Human Resource Management or related field.[]

---

https://www.hrci.org/certifications/individual-certifications/sphr (last visited Feb. 23, 2024).

2. Eight (8) years of responsible professional administrative experience in human resources supervising major divisions of recruitment, classification, compensation, benefits, performance management and training. This experience must have been at an exempt (salaried) level.

3. One (1) year of human resource experience in a Civil Service system and/or other governmental agency (municipal/county/state/federal).

The following qualifications are preferred, but not required:

- Master's degree
- Related Professional Certification such as SHRM-SCP or SPHR

. . . .

**NOTE:** If appointed, a related professional certification in human resource management such as SHRM-SCP or SPHR must be obtained during the probationary period. No probationary period may last longer than one year. Failure to obtain a professional certification in human resource management will result in termination.

Mr. McClendon also stated that "during the interview process, it was indicated that the certification was not required and it was made clear that Mr. McClendon did not hold certifications."

Further, Mr. McClendon contended that "[d]uring the course of [his] employment, he received outstanding evaluations and positive feedback from his immediate supervisor, David Callahan" ("Mr. Callahan"). To support this statement, Mr. McClendon attached a document entitled "2021 Performance Planning & Evaluation," in which Mr. Callahan gave Mr. McClendon an overall rating of "Exceeds Expectations." Mr. McClendon also attached inter-office memoranda dated April 20, 2021, October 20, 2021, and June 10, 2022, in which Mr. Callahan expressed that he was pleased with Mr. McClendon's performance.

Additionally, Mr. McClendon contended in his appeal that although he attempted to take the professional certification test twice but did not pass, he

6

instead "received several other similar certifications and submitted it [sic] to his supervisor." To this end, Mr. McClendon attached certificates of completion from Linkedin Learning for courses titled "Human Resources: Using Metrics to Drive HR Strategy," "Human Resources: Managing Employee Problems," "Human Resources: Pay Strategy," "Administrative Human Resources," "Human Resources: Strategic Workforce Planning," "Human Resources: Compensation and Benefits," and "Human Resources: Payroll." These certificates were all from June 2022.

Moreover, Mr. McClendon stated that "[o]n November 7, 2020, Mr. McClendon was advised that he satisfied the probationary/working test period and that he would be made permanent on November 17, 2020." In this regard, Mr. McClendon submitted with his appeal a letter dated November 6, 2020, which stated, "You have satisfied the requirements of the Probationary/Working Test period. As a result you will be made permanent in the position of Human Resources Utility Administrator [sic] November 17, 2020." Though the signature on this letter is illegible, other portions of the record establish that Jackie Hadley-Boatman ("Ms. Boatman") signed it and that she was subordinate to Mr. McClendon in the human resources department of SWBNO in the position of utilities service manager.[11]

---

[11] At the hearing on this matter, Mr. McClendon testified that he subpoenaed Ms. Boatman but was never able to reach her.

**Motion for Summary Disposition**

On August 16, 2022, SWBNO filed a "Motion for Summary Disposition," wherein SWBNO moved to dismiss Mr. McClendon's appeal to the Commission on the basis that Mr. McClendon had no legal right of appeal under the Commission's rules as a probationary employee. SWBNO argued that "an individual appointed to the [UHRA] position without one of the designated professional certifications was required to obtain the [c]ertification during the probationary period, under penalty of termination." That is, SWBNO argued that "no appointee could obtain permanent status without one of the designated professional certifications" listed in the UHRA job posting. SWBNO stated that because it had appointed Mr. McClendon to the UHRA position without the required certification, he had to obtain one of the designated professional certifications to acquire permanent status and remain in the position. However, as asserted by SWBNO, Mr. McClendon received an additional year and a half to obtain the certification (in addition to his initial, one-year working test period) but failed to do so and thus never became a permanent employee with the right to appeal to the Commission. SWBNO further argued that when one seeks an appeal with the Commission but fails to meet the requirements for an appeal, then the Commission's rules provide for the summary dismissal of the action.[12]

---

[12] Civil Service Rule II, § 6.1 states:

At any time after an appeal has been docketed, a written request may be filed by any interested party for summary disposition thereof on any of the following exclusive grounds:

. . . .

(b)  that the appellant has no legal right of appeal[.]

On November 4, 2022, the Commission issued an order, which denied SWBNO's Motion for Summary Disposition. Subsequently, SWBNO filed a Motion for Reconsideration, which the Commission denied in a November 21, 2022 order. Of import, in that order, the Commission also noted that "[a]t the hearing of this matter, the parties may present evidence about whether [Mr. McClendon] obtained permanent status. The Commission has not made a determination on this issue."[13] Thereafter, the matter proceeded to a hearing with Jay Ginsberg ("Mr. Ginsberg") as the hearing examiner.

## March 23, 2023 Hearing

On March 23, 2023, Mr. Ginsburg presided over the hearing in this matter and stated at the outset that "the issue before the [C]omission is whether or not [Mr. McClendon] was probationary at the time of his termination. If, in fact, it is established that he was probationary, then the appeal will be denied." Mr. Ginsburg then heard testimony, in pertinent part, from Mr. McClendon; Ms. Trepagnier; Shelly Stolp ("Ms. Stolp"); Lenia Segura ("Ms. Segura"); Mr. Callahan; and Miera Moore ("Ms. Moore").

*Mr. McClendon*

SWBNO called Mr. McClendon as its first witness, and counsel for SWBNO began by asking Mr. McClendon his understanding of the definitions of "permanent employee" and "working test period." Mr. McClendon testified that

---

[13] We note that on August 16, 2022, Mr. McClendon filed an Amended Civil Service Appeal, wherein he added a claim for discrimination. In response, SWBNO filed a "Motion for Summary Disposition of Amended Appeal." Therein, SWBNO again argued that Mr. McClendon had no legal right to appeal his termination. SWBNO also argued that Mr. McClendon had not timely filed his Amended Civil Service Appeal. In its November 4, 2022 order, the Commission granted SWBNO's Motion for Summary Disposition of Amended Appeal on the basis that Mr. McClendon's discrimination appeal was untimely.

his understanding of a permanent employee in the city civil service was "[s]omeone who has been notified and completed their 12 months of working" and someone who has "met [the] minimum qualifications." Additionally, Mr. McClendon testified that his understanding of a "working test period" was "the probationary period of an employee who, as a new employee, [has] to meet the minimum qualifications and pass . . . 12 months of time there with the entity." Mr. McClendon agreed that, based on the Civil Service Rules, to become a permanent employee, one has to pass the probationary or working test period. Mr. McClendon testified that at the time SWBNO terminated him, he was a permanent employee because he received a letter from SWBNO stating that he had completed his working test period and because he had met all of the requirements of his working test period.

Regarding the professional certification, Mr. McClendon testified that he had not read the note on the job posting stating that "a related professional certification in human resource management such as SHRM-SCP or SPHR must be obtained during the [one-year] probationary period" when he applied for the UHRA position in 2019. Instead, Mr. McClendon stated that he only saw the section providing that the professional certification was "preferred but not required." Mr. McClendon testified that he first became aware of the necessity of obtaining a professional certification to remain in the UHRA position when SWBNO attempted to reclassify his position in July 2020 and received notice from the Department in response that he needed a professional certification.

Mr. McClendon further testified that Mr. Callahan subsequently told him that the professional certification requirement on the job posting had been a mistake in that "the certification was not supposed to be part of the position or the

posting." Thereafter, according to Mr. McClendon, Mr. Callahan asked the Department to remove the professional certification requirement "because it was a mistake and it should have never been in there."[14] Mr. McClendon explained that in response, however, the Civil Service Department maintained its position that he needed to obtain a professional certification during his probationary period but proposed that Mr. McClendon could be made a transient employee to have additional time to obtain the professional certification because he was nearing the end of his probationary period.[15] Mr. McClendon stated that no one communicated to him the suggestion to transfer him to transient status. Rather, according to Mr. McClendon, he learned about the transfer after it happened. Subsequently, counsel for SWBNO introduced into evidence a "Requisition for Employee" form ("Requisition Form"), which was dated November 9, 2020; listed the effective date as November 16, 2020; was signed by Mr. Callahan and Mr. Korban; and stated that it was "[c]hanging the UHRA position to [t]ransient position for 90 days (until February 15[, 2021])." Mr. McClendon confirmed that this was something generated by SWBNO's human resources department and submitted to the Civil Service Department.

Counsel for SWBNO also asked Mr. McClendon about his start date, and he responded, "November 17th [or] 18[th] of 2019, whatever that Monday [was]."

---

[14] Mr. McClendon's testimony in this regard is supported by an exhibit introduced into evidence by SWBNO, specifically an email sent by Mr. Callahan on October 21, 2020, in which he requested that the Civil Service Department resolve the issue in favor of not requiring the professional certification because it was supposed to be a preferred but not required qualification.

[15] Mr. McClendon's testimony is supported by an October 28, 2020 email by Ms. Trepagnier and which SWBNO introduced into evidence. In the email, Ms. Trepagnier explained that the issue would not be resolved according to Mr. Callahan's position but suggested that Mr. McClendon could be transferred to transient status to grant him additional time to obtain the professional certification.

Mr. McClendon agreed that his probationary period was twelve months long and would have ended one year after his start date. Mr. McClendon testified that after learning that the Civil Service Department maintained its position he needed to obtain the professional certification, he received the November 6, 2020 letter about permanent status from Ms. Boatman with SWBNO but that no one from the actual Civil Service Department informed him that he could reach permanent status before obtaining the professional certification. Counsel for SWBNO asked Mr. McClendon how Ms. Boatman could make him permanent when Mr. Korban, who was SWBNO's executive director, and Mr. Callahan, who was Mr. McClendon's direct supervisor, had placed him in transient status via the Requisition Form, to which Mr. McClendon responded, "I [do not] have an answer to that." Mr. McClendon countered, however, that Ms. Boatman had the authority to grant him permanent status even if that differed from what Mr. Callahan and Mr. Korban did "[b]ecause she had appointed authority." Testifying about the contents of the letter, Mr. McClendon agreed that although the letter was dated November 6, 2020, and stated he had already satisfied his probationary period, the end of his probationary period would have actually been one year after his first day of work, i.e., one year after November 17 or 18, 2020. As previously stated, the letter provided that Mr. McClendon would become permanent on November 17, 2020, because he had satisfied the requirements of his probationary period. When counsel for SWBNO asked Mr. McClendon whether he had in fact satisfied the requirements of his probationary period according to the Civil Service Department, he responded, "[b]ased on what [you were] asking earlier, no." Nonetheless, Mr. McClendon testified that he showed the November 6, 2020 letter to Mr. Callahan, who responded, "[we are] going to work this out . . . and [we are] going to fix it"

12

whereupon Mr. McClendon "was [under] the assumption that [he] was permanent and good to go."

Mr. McClendon stated that he remained under that assumption even upon receiving notice that he had been placed in provisional status after his transient status period. In this regard, Mr. McClendon explained that "[t]hey put me in provisional but I was permanent from my point of view, based on the letter I received from the entity [(i.e., the November 6, 2020 letter from Ms. Boatman)]." Despite this belief that he was already permanent, Mr. McClendon testified that in December 2020 he agreed to try to obtain the certification as long as he would be made permanent retroactive to November 16, 2020, in order "to be a team player" and because the Department "was going to terminate [him] if [he] did not . . . try to take the certification."[16] Mr. Ginsberg asked Mr. McClendon to reconcile his belief that he was already permanent upon receiving the November 6, 2020 letter with his subsequent concern in December 2020 about making sure his permanent status was retroactive to November 16, 2020. Specifically, Mr. Ginsberg questioned, "Why would it matter whether it went back to a certain date if you . . . had reached permanent status, what difference would it make?" Mr. McClendon initially responded, "I [do not] know," but then clarified, "My understanding [was that] I was permanent, so why were [they] putting me in provisional to lose my permanent status that I . . . felt like I gained."

Mr. McClendon also briefly testified about the LinkedIn Learning courses he completed in June 2022, stating that Ms. Trepagnier informed him that those did not qualify as his professional certification. In this regard, counsel for SWBNO

---

[16] This information about Mr. McClendon agreeing to try to obtain the certification was reflected in a series of emails entered into evidence by SWBNO.

then asked Mr. McClendon, "Civil [S]ervice determine[d] what certification you were required to get?" He responded, "Civil Service told me I had to take the [S]PHR."

### *Ms. Trepagnier*

Counsel for SWBNO next called Ms. Trepagnier as a witness, and she identified herself as the "Civil Service Director, personnel director at the city of New Orleans." Ms. Trepagnier explained that she had been in that position for the previous two and a half years but had worked at civil service for twenty-three years. When asked about her responsibilities as the personnel director, Ms. Trepagnier responded that she had "[t]o oversee all the operations of the [Civil Service] [D]epartment and to enforce the rules in the merit system."

At the outset, Ms. Trepagnier defined several terms found in the Civil Service Rules. When asked to explain what a working test period is under the Civil Service Rules, Ms. Trepagnier stated, "So, a working test period is the timeframe that the department has to assess a new hire or recently promoted person's performance to determine if the department wants to extend permanent status to that person." She explained that if someone fails to meet the requirements of the working test period, then that person is terminated or returned to their previous position in the case of an attempted promotion. Defining permanent status, Ms. Trepagnier testified that it "is where an employee comes into a right[] to a position" and has "the right to appeal any discipline . . . against [him or her]." Ms. Trepagnier also defined a transient appointment and stated that it "is a temporary appointment, during which an employee does not obtain permanent status and [it is] limited to 90 days. [It is] a temporary appointment." Then Ms. Trepagnier identified provisional status as "another type of temporary appointment, wherein, a

14

person does not obtain permanent status. And, [there is] not a 90-day limitation like there is on transient appointments."[17] Ms. Trepagnier explained that neither transient nor provisional appointees have a right to appeal except in the cases of discrimination or whistleblowing. Ms. Trepagnier also testified about job postings for SWBNO positions. She explained that the process is that the Civil Service Department creates the job postings in consultation with SWBNO. Ms. Trepagnier stated that the Civil Service Department has final authority over the requirements of the job though.

Regarding Mr. McClendon's transfer to transient status, Ms. Trepagnier explained she recommended that SWBNO place him in transient status in October 2020 "[i]n order to provide for additional time to allow him to meet the requirements of the job posting that required that he attained a professional [h]uman [r]esources certification." Ms. Trepagnier explained that after SWBNO transferred Mr. McClendon to transient status, the Civil Service Department subsequently agreed to change Mr. McClendon to a provisional appointment because there would be some benefits, such as health insurance and leave accrual, that he did not receive in transient status.

Ms. Trepagnier then explained the concept of delegated authority, whereupon the following colloquy occurred:

> A.     So, under delegated authority, the department has the ability to decide when they want to post positions. They can screen applications, create eligible lists and certify those eligible lists. The . . . final say over the content of the job posting still rests with the Civil Service Department.

---

[17] Ms. Trepagnier later explained that, according to the Civil Service Rules, provisional appointments are not to last longer than one year unless extended by the Commission.

Q.      And, between the Civil Service Department and the appointing authority,[18] who has final say over whether or not somebody has met their minimum requirements for a position?

A.      [It is] ultimately the Civil Service Department [that] would make that decision. . . .

. . . .

A.      Okay. So, [you are] asking about who ultimately decides if a person meets the minimum qualifications?

Q.      Yeah. Who ultimately decides [if] the person meets the minimum qualification?

A.      The Civil Service Department has final say in that.

Thus, Ms. Trepagnier testified that even if the Civil Service Department delegates some authority to an entity like SWBNO, the final determination as to whether someone has met the minimum qualifications for their position rests with the Civil Service Department.

On cross-examination, counsel for Mr. McClendon also questioned Ms. Trepagnier about delegated authority and the subject job posting, whereupon the following colloquy occurred:

[Q.]    We spoke a little bit about this, but there was a delegation from the civil service to Sewerage and Water Board to handle employment hiring; is that right?

A.      They always have the ability to hire.

Q.      Okay. But, they were also able to evaluate candidates for eligibility for positions, correct?

A.      Correct.

Q.      And, they also could certify a list of eligible candidates real quick; is that right?

---

[18] The Civil Service Rules define "Appointing Authority" as "any officer, board, agency, commission, or person having the power to make appointments to positions in the city service." Civil Service Rule I, §1(5).

A.    Correct.

Q.    And, they could hire from that list of eligible candidates?

A.    Correct.

Q.    Okay. And, that started around June 20, 2016; is that right?

A.    I believe so.

Q.    And, it was a pilot program?

A.    Correct.

. . . .

Q.    So, for the most part, there are individuals at [SWBNO] that are handling functions that would otherwise be handled by civil service in other departments?

A.    Correct.

. . . .

Q.    If — can you tell me why — what authority under civil service rules do you have to hold the Sewerage and Water Board to that position if they are telling you [it is] a mistake?

A.    I . . . [would not] characterize [that] they said it was a mistake. So, the personnel director has the ultimate authority to set the minimum qualifications for every position within the . . . civil service system.

. . . . .

Q.    Okay. And then, I want you to look at the next one — not the next sentence, but the sentence after that, the personnel director shall seek appointing authority input into establishing the minimum qualifications and program examination; is that right?

A.    Correct.

Q.    So . . . [when] the HR functions was [sic] delegated to the Sewerage and Water Board, did any of this rule change in the way that civil service handled minimum qualifications?

A.    No.

. . . .

17

A. . . . [W]e mutually agreed upon what was posted.

When asked further on cross-examination "[w]here in the civil service rules does it say that you get to decide, or [you are] the ultimate authority on what guidelines should be used to assess certifications?" Ms. Trepagnier responded, "Because, as the personnel director, I preside over a uniform classification and compensation system [that is] mandated by Article 10 of the Louisiana constitution. And so, applying a standard review of things like professional certifications, as they relate to minimum qualifications, is part of the enforcement of that uniform pay plan." She further explained that "[t]hose duties cannot be delegated, the enforcement of the uniform classification and compensation plan is not delegated, that is part of Article 10."

Ms. Trepagnier testified even more about delegated authority but also in the context of the importance of the Civil Service Director retaining final say regarding minimum qualifications:

A. It means that [SWBNO] [was] delegated certain tasks that are normally the responsibility of Civil Service staff, which are to vet the applications and create an eligible list and certify that eligible list.

Q. What about with respect to minimum qualifications?

A. No. Again, as we discussed earlier, the minimum qualifications piece did not change as part of delegation.

. . . .

MR. GINSBERG:
And, can the Sewerage and Water Board unilaterally modify mineral [sic] requirements?

A. No.

. . . .

18

A. Because, [it is] important for transparency to the public, in terms of, [what is] published there that, again, that we adhere to [what is] published.

MR. GINSBERG:
Would there be a concern that potential applicants had chosen not to apply because there were minimum requirements that they knew they [could not] meet?

A. That is correct.

Thus, Ms. Trepagnier explained that the delegation to SWBNO did not alter that the Civil Service Director retains ultimate authority in deciding minimum qualifications because this relates to the enforcement of a uniform system. Moreover, she disagreed with the characterization that a mistake had been made in the job posting and stated that the Civil Service Department and SWBNO had agreed on the job posting.

Counsel for SWBNO asked Ms. Trepagnier about the November 6, 2020 letter signed by Ms. Boatman. Ms. Trepagnier testified that the letter did not make Mr. McClendon a permanent employee, explaining that "[a] notice to the employee that [they have] been made permanent would be null and void if they fail to comply with the provisions, the requirements of the job announcement." In Mr. McClendon's case, Ms. Trepagnier stated that the requirement for the UHRA position was "[t]o obtain a professional certification in human resources during the probationary period." The following colloquy occurred regarding the authority of Ms. Boatman to issue the letter, particularly in light of Ms. Trepagnier having already determined that Mr. McClendon did not meet the minimum qualifications (professional certification) for remaining in the UHRA position past the one-year working test period by the time Ms. Boatman authored the letter:

Q. Now, where in the civil service rules does it say that that letter from Jackie Boatman letting Mr. McClendon know his permanent status became null and void?

A. It [does not] say that in the rules.

Q. Does it say anywhere there that civil service can override an appointed agency from determining whether an employee is permanent?

A. [It is] not overriding when they [do not] meet the criteria.

Ms. Trepagnier disagreed with Mr. McClendon's contention that Ms. Boatman had appointed authority to make him permanent via the letter, stating "a low level HR person does not have the authority to . . . hire or fire people into the classified services." Instead, Ms. Trepagnier stated that Mr. Korban was the appointing authority for SWBNO, whereupon the following colloquy occurred:

Q. Even if they were delegated that?

A. Yeah. Ultimately, the executive director is the only person that can authorize a hire or termination at Sewerage and Water Board.

Q. Can he delegate his authority to anyone under him?

A. Not to hire or fire. Ultimately, [he is] the only person that can hire or fire.

       . . . .

A. Just because they indicate he is permanent in error [does not] make him permanent. And, again, [that is] after I already informed them in writing that they needed to make him transient before the end of his probationary [period].

MR. GINSBERG:
So, [you are] saying that if, in fact, that letter had been signed by the appointing authority, it still would not have any effect?

A. Correct.

Thus, according to Ms. Trepagnier, Mr. Korban had the appointing authority for SWBNO. Regardless, as Ms. Trepagnier explained, even with appointing authority

Mr. Korban could not have made Mr. McClendon permanent because she, as Civil Service Director, had already determined that Mr. McClendon did not meet the minimum qualifications for the UHRA position.

Counsel for SWBNO also asked Ms. Trepagnier about an "Applicant Master Record" for Mr. McClendon, which SWBNO entered into evidence. Ms. Trepagnier explained that it constituted Mr. McClendon's record in the Civil Service Department's system and that it reflected Mr. McClendon in transient then provisional status but never permanent status. Therefore, per Ms. Trepagier, the Civil Service Department's official records do not reflect Mr. McClendon reaching permanent status.

Ms. Trepagnier testified that two and a half years after Mr. McClendon started with SWBNO, she ultimately informed SWBNO that he needed to be terminated or demoted to a different position because he still had not met the requirements of the job posting. When asked whether this action was within her authority as the personnel director, Ms. Trepagnier answered affirmatively. Ms. Trepagnier clarified that it was within SWBNO's discretion whether to demote or terminate Mr. McClendon in response to her directive.

Ms. Trepagnier also testified about Mr. McClendon's time in transient status. She agreed that during this time Mr. McClendon "was the same employee working in the same job" and at "the same classification." As Ms. Trepagnier explained, Mr. McClendon's working test period merely paused by his placement in transient and then provisional status.

Regarding whether Mr. McClendon could obtain permanent status just by remaining in the position for one year, the following colloquy occurred during Ms. Trepagnier's testimony:

Q.    Is there any dispute that if, in fact, he had stayed in the probationary status for one year, he would have automatically been made permanent by law . . . ?

A.    I think it would be in dispute because, again, he still would . . . have failed to satisfy the provisions of the announcement regarding the probationary period.

Q.    Okay. So, [let us] say that the issue of minimum qualifications [did not] apply in this case, is it the position of civil service that when — if someone stays in probationary appointment for one year, they automatically obtain permanent status?

A.    Yes.

Q.    So, what is different in this case is the fact that the minimum qualifications is — the civil service's position is that Mr. McClendon did not meet minimum qualifications?

A.    He failed to meet a requirement of the minimum qualifications, which was to obtain the professional certification in human resources during the probationary period.

. . . .

Q.    . . . Who determines if an employee has satisfied the probationary period?

A.    Typically, [that is] the responsibility of the appointing authority.

Q.    So, if Sewerage and Water Board said they satisfy probation, civil service would not be involved?

A.    In a typical situation, but a situation where, again, somebody has not met the requirements of the job posting, then we will get involved.

Therefore, according to Ms. Trepagnier, one cannot obtain permanent status by the mere passage of time if they have not met the minimum qualifications for the position. In that instance, according to Ms. Trepagnier, the Civil Service Director can override an appointing authority's determination that an employee has satisfied the working test period. As earlier explained by Ms. Trepagnier, this relates to the

Civil Service Director's constitutionally-mandated task of overseeing and enforcing a uniform system of pay and classification.

### *Ms. Stolp*

Next, Ms. Stolp testified. She stated that she previously worked as personnel administrator for the Civil Service Department. Ms. Stolp explained that in her capacity as personnel administrator, she worked with Mr. Callahan to finalize the qualifications for the UHRA job posting. Regarding the final version of the job posting, Ms. Stolp explained that although she worked with Mr. Callahan on it, he had to sign off on the job posting before she could post it. To this end, Ms. Stolp testified that it "would not have been posted unless we all discussed it and approved it." Discussing the process further, Ms. Stolp recalled that the professional certification continued to be a requirement even after SWBNO made other changes to the job posting. When asked whether she would have had any role in fixing a mistake made as to what the minimum qualifications were, Ms. Stolp responded, "[There was] no mistake, [that is] . . . the whole point. The approval has to come from [SWBNO], in this case, [Mr.] Callahan. And so, we [got] the approval — so there [was] no mistake."

Of note, during Ms. Stolp's testimony, counsel for Mr. McClendon discussed with her what was labeled as Appellant Exhibit 4, which Ms. Stolp identified as a draft of the UHRA job posting that did not contain the professional certification requirement. Ms. Stolp stated that it "would have been the draft that we started working from" and that any additional language had been added by either the Civil Service Department or SWBNO. During Ms. Stolp's testimony, counsel for Mr. McClendon also discussed with her what was labeled Appellant Exhibit 5, minutes from a civil service meeting that occurred on June 20, 2016,

23

regarding delegated authority. Ultimately, counsel for Mr. McClendon attempted to introduce Appellant Exhibits 4 and 5 into the record, but counsel for SWBNO objected. Mr. Ginsberg sustained the objections but allowed counsel for Mr. McClendon to proffer Appellant Exhibit 4.

### Ms. Segura

Following Ms. Stolp, Ms. Segura testified. She explained that she previously worked as the management development specialist II for SWBNO, which was two positions below Mr. McClendon as UHRA. In pertinent part, Ms. Segura testified about the process by which SWBNO sent letters notifying employees that they had reached permanent status. She stated that, at the times relevant herein, Ms. Boatman was responsible for the permanent status letters that came through the human resources department. Ms. Segura testified that she knew the process because she handled it after Ms. Boatman left SWBNO, explaining "the clerical person that was responsible for monitoring the probationary employees, those new hires that came in on their probationary status, whether six months or a year's probation, she would monitor those, and we would send out notifications to the supervisors to let them know, hey, this probationary is coming . . . to an end." Thereafter, according to Ms. Segura, the supervisor had "to let us know that we want to extend the probationary [period] or not. As far as a[n] employee that is one year[']s probation, they cannot extend . . . based on the civil service rules." As explained by Ms. Segura, subsequently the "clerical person types up the letter, the letters [came] to me for review and signature, and then they [went] back to her in order to make a copy to put in the folder and then send to the employees." As Ms. Segura described the process, if she did not hear back from the employee's

24

supervisor, the permanent status letter was generated as a matter of course without any follow-up to the supervisor beforehand.

*Mr. Callahan*

Mr. Callahan also testified and, when asked whether it was his intent to require professional certification for the UHRA job posting, he responded, "Well, as clearly indicated in the email exchange at the time, yes." Mr. Callahan explained that there had been back and forth discussions about whether to include the professional certification as a requirement, such that by the time SWBNO learned in July 2020 that Mr. McClendon needed the professional certification, he had simply forgotten that he had ultimately decided to include it. Mr. Callahan also testified regarding the November 6, 2020 letter signed by Ms. Boatman and stated, "I [do not] have any recollection of that letter, other than knowledge of it after the fact, later after the fact. . . . I [do not] have any knowledge of how that . . . occurred. That [did not] make any sense to me, honestly." When asked whether the letter provided Mr. McClendon with permanent status, Mr. Callahan responded, "I [do not] believe it did." Regarding the letter, Mr. Callahan also testified that "it [did not] seem to [him] like the procedure was followed correctly here" because he did not recall being notified in advance as he should have been. Regardless, Mr. Callahan explained that around the same time as the letter, he and Mr. Korban signed the Requisition Form that transferred Mr. McClendon to transient status.

Counsel for SWBNO asked Mr. Callahan his opinion as to whether SWBNO or the Civil Service Department has the final authority over whether an employee attains permanent status, and he stated, "I think civil service has the final call." Counsel for SWBNO asked Mr. Callahan who has the final authority over job creations and requirements for job postings, and he again answered that the Civil

Service Department has the final authority. Mr. Callahan testified that, in these regards, he agreed with Ms. Trepagnier's explanation regarding the process, i.e., SWBNO has input, but the Civil Service Department has final approval.

*Ms. Moore*

After Mr. Callahan, Ms. Moore testified and stated that her current classification with SWBNO was utility service manager and current positon was interim human resources director. In pertinent part, counsel for Mr. McClendon asked Ms. Moore about a document entered into evidence as Appellant Exhibit 8, which has a heading at the top of "Employee Extra Fields." Ms. Moore explained that "this is when you go under the employee maintenance screen for an employee, and you go under the employee extra fields, it will tell you when that person started, and when does their probationary period end." The Employee Extra Fields lists Mr. McClendon's Probationary start date as November 18, 2019, and his probationary end date as November 17, 2020.

At the close of testimony, Mr. Ginsberg informed the parties that he would submit an advisory report to a three-member panel of the Commission, which would render the ultimate decision.

**Commission Decision**

On May 11, 2023, the Commission issued a decision, in which it dismissed Mr. McClendon's appeal on the basis that "he ha[d] no right of appeal." In its decision, the Commission explained that the March 23, 2023 hearing had been "limited to the threshold issue of whether Mr. McClendon obtained permanent status." In pertinent part, the Commission noted that Mr. McClendon began his employment with SWBNO in the UHRA position on November 18, 2019. The Commission determined that, thereafter, Mr. McClendon never obtained

permanent status because SWBNO transferred Mr. McClendon to temporary appointments (transient status then provisional status) prior to the expiration of his one-year probationary period (i.e., prior to November 18, 2020) to afford him more time to obtain the professional certification. The Commission found that SWBNO had authority to enact these transfers on the basis of Civil Service Rule VII, § 1.1. Further, the Commission explained that because only regular employees who have obtained permanent status may appeal their termination of employment to the commission, Mr. McClendon had no right of appeal because he never finished his probationary period and thus never obtained permanent status.

The Commission also found that the November 6, 2020 letter from Ms. Boatman was insufficient to confer permanent status on Mr. McClendon. Citing Civil Service Rule VI, § 3.3, the Commission explained that "the decision about whether Mr. McClendon met the minimum qualifications for the position of [UHRA] rested with" Ms. Trepagnier as the Director of Personnel and that SWBNO "lacked the authority to grant permanent status to Mr. McClendon when, in the Director of Personnel's opinion, he had not met the minimum qualifications for the position." The Commission also observed that the letter was "sent before the expiration of the probationary period, without the knowledge of Mr. McClendon's immediate supervisor, and before Mr. McClendon met the minimum qualifications of the position," such that it "did not confer permanent status on Mr. McClendon."

The Commission concluded that "[b]ecause only employees who obtain permanent status have a right of appeal under [Civil Service] Rule II, § 4.1, Mr. McClendon ha[d] no right of appeal." Mr. McClendon's timely appeal of the Commission's decision to this Court followed.

27

## ASSIGNMENTS OF ERROR

On appeal, Mr. McClendon assigns four errors to the Commission's decision and one error to Mr. Ginsberg's evidentiary rulings.  Specifically, he contends:

1.     The Civil Service Commission erred in finding that the Civil Service is the sole determinative body regarding the minimum qualifications for SWB[NO] positions despite delegation in 2016.

2.     The Civil Service Commission erred in finding that [Mr.] McClendon was not a permanent employee.

3.     The Civil Service Commission erred in finding that the transfer to "Transient" status was effective before the probationary period ended.

4.     The Civil Service Commission erred in finding that the letter issued by the SWB[NO] notifying McClendon of his permanent status was ineffective.

5.     The Hearing Officer for the Civil Service Commission erred in not permitting into evidence proffered Exhibit Appellant 4 and sustaining the objection for Exhibit Appellant 5.

Before turning to our discussion of the merits of these assignments of error, we consider the applicable standard of review.

## STANDARD OF REVIEW

This is a city civil service case, in which Mr. McClendon sought an appeal with the Commission regarding his termination from SWBNO. Louisiana Constitution Article 10, Section 12(B) (1974) provides that "[t]he decision of a [city civil service] commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located, upon application filed with the commission within thirty calendar days after its decision becomes final." In discussing this provision, this Court has previously explained that "[w]hen the Commission issues a decision under its quasi-judicial powers, the decision is subject to appellate review." *City of New Orleans v. New Orleans Civil*

*Serv. Comm'n*, 2020-0521, p. 5 (La. App. 4 Cir. 12/1/21), 332 So.3d 717, 720-21 (quoting *Hellmers v. Dep't of Fire*, 2019-0420, p. 10 (La. App. 4 Cir. 10/30/19), 364 So.3d 370, 377). More particularly, the Commission's decision "is subject to review on any question of law or fact . . . ." *Collier v. Sewerage & Water Bd.*, 2018-0097, p. 7 (La. App. 4 Cir. 8/1/18), 253 So.3d 190, 195 (quoting *Cure v. Dep't of Police*, 2007-0166, p. 2 (La. App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094).

When an appellate court reviews a decision of the Commission, the appellate court "employs a mixed standard of review." *Jones v. Dep't of Pub. Works*, 2022-0121, p. 14 (La. App. 4 Cir. 10/31/22), 351 So.3d 788, 797 (citing *Morrison v. New Orleans Police Dep't*, 2022-0051, p. 7 (La. App. 4 Cir. 7/13/22), 344 So.3d 259, 265). The standard of review is mixed because it "depend[s] on the issue being analyzed." *Pitre v. Dep't of Fire*, 2021-0632, p. 7 (La. App. 4 Cir. 4/20/22), 338 So.3d 70, 75. As this Court explained in *Pitre*:

> First, the review by appellate courts of the factual findings in a civil service case is governed by the manifest error or clearly erroneous standard. Second, when the Commission's decision involves jurisdiction, procedure, and interpretation of laws or regulations, judicial review is not limited to the arbitrary, capricious, or abuse of discretion standard. Instead, on legal issues, appellate courts give no special weight to the findings of the trial court [(i.e., *de novo* review)], but exercise their constitutional duty to review questions of law and render judgment on the record. A legal error occurs here when a trial court applies the incorrect principles of law and such errors are prejudicial. Finally, a mixed question of fact and law should be accorded great deference by appellate courts under the manifest error standard of review.

2021-0632, p. 7, 338 So.3d at 75 (quoting *Russell v. Mosquito Control Bd.*, 2006-0346, pp. 7-8 (La. App. 4 Cir. 9/27/06), 941 So.2d 634, 639-40). *See also Morales v. Off. of Inspector Gen.*, 2022-0216, pp. 7-8 (La. App. 4 Cir. 10/5/22), 366 So.3d 526, 534-35. With this standard of review in mind, we turn our discussion to the assignments of error.

**DISCUSSION**

*Assignment of Error Number One*

**<u>The Determinative Body Regarding Minimum Qualifications</u>**

In his first assignment of error, Mr. McClendon argues that the "Commission erred in finding that the Civil Service is the sole determinative body regarding the minimum qualifications for SWB[NO] positions despite delegation in 2016." He contends that the 2016 "delegation included allowing SWB[NO] to create and evaluate minimum qualifications for SWB[NO] positions." Mr. McClendon further argues that "nothing in Article X of the Louisiana Constitution prohibits delegation of powers to the appointing authority" including the "delegation of powers regarding the setting and evaluating [of] minimum qualifications." In response, SWBNO counters that "[t]he Civil Service Commission is constitutionally charged with the authority to regulate the classified service, including 'the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters and transactions.'" SWBNO states that "[a]t no time has Civil Service delegated ALL of its authority to [SWBNO]" and that "any delegation of authority is limited by the mandates contained in the Louisiana Constitution." To this end, SWBNO argues that Ms. Trepagnier "always retained the right, authority, and final say regarding the minimum qualifications" for the UHRA position. SWBNO observes, moreover, that "[t]hroughout these proceedings, [SWBNO] has not, and does not here argue, that the delegation [Mr.] McClendon seeks to enforce[] provided it with the authority to waive the minimum requirements of the position at issue." To resolve this assignment of error, we turn

30

to the Louisiana Constitution and the Civil Service Rules to ascertain whether SWBNO or Civil Service has the authority to designate the minimum qualifications for a position in the City's civil service and to direct an employee's removal if those qualifications are not met.

The Commission derives its authority from Article X of the Louisiana Constitution, which establishes the city civil service system "and includes all persons holding offices and positions of trust or employment in the employ of each city having over four hundred thousand population and in every instrumentality thereof." La. Const. art. X, § 1; *Scott v. Dep't of Police*, 2006-0956, p. 2 (La. App. 4 Cir. 1/31/07), 951 So.2d 1281, 1282. While the Commission's primary function is "as a quasi-judicial body," the Louisiana Constitution also empowers the Commission "to generally supervise the civil service system and to establish rules for that system's administration." *Scott*, 2006-0956, p. 3, 951 So.2d at 1282. That is, the Louisiana Constitution vests exclusive authority with the Commission "for the administration and regulation of the classified service, including the power to adopt rules for regulating employment," as well as "pay, removal, certification, [and] qualifications . . . ." La. Const. art. X § 10(A)(1)(a) (1974). That constitutional provision, La. Const. art. X, § 10(A)(1)(a), "specifically confers broad and general rulemaking powers upon [the Commission] to administer and regulate in [the delineated] areas." *Reimer v. Med. Ctr. of La. at New Orleans*, 1995-2799, p. 4 (La. App. 4 Cir. 1/29/97), 688 So.2d 165, 168. Further, La. Const. art. X, § 10(A)(4) provides that "[r]ules adopted pursuant hereto shall have the effect of law . . . ." *See also Scott*, 2006-0956, p. 3, 951 So.2d at 1282 (stating that the rules promulgated by the Commission "have the effect of law" (citing La. Const. art. X, § 10(A)(4)). As this Court has previously held, the Commission's

31

"exclusive power to adopt rules regulating the classified service in the areas specifically enumerated in Section 10(A)(1) . . . . cannot constitutionally [be] infringe[d] on . . . ." *New Orleans Firefighters Ass'n Local 632 v. City of New Orleans*, 590 So.2d 1172, 1175 (La. 1991). Of the specific areas of power enumerated in Article X, qualifications and certification relate to the Commission's "express power to adopt a uniform pay and classification plan." *Id.*, 590 So.2d at 1176.

One area in which the Commission is constitutionally charged with rulemaking concerns permanent employees and promotions of employees. Louisiana Constitution Article X, §7 states, in pertinent part, that:

> Permanent appointments and promotions in the classified . . . city service shall be made only after certification by the appropriate department of civil service under a general system based upon merit, efficiency, fitness, and length of service, as ascertained by examination which, so far as practical, shall be competitive. . . . Each commission shall adopt rules for the method of certifying persons eligible for appointment, promotion, reemployment, and reinstatement and shall provide for appointments defined as emergency and temporary appointments if certification is not required.

Like the powers designated in La. Const. art. X, § 10, the Commission's authority to determine the process for permanent appointments and promotions constitutes an exclusive power granted to the Commission by the Louisiana Constitution because this pertains to the "selection and promotion of public employees on the basis of merit, fitness and qualifications." *Police Ass'n of New Orleans v. City of New Orleans*, 1994-1078, p. 8 (La. 1/17/95), 649 So.2d 951, 959. This provision relates to the principal objectives of civil service to "establish a system under which 'non-policy forming' public employees are selected on the basis of merit . . . ." *Scott*, 2006-0956, p. 3, 951 So.2d at 1282. With these constitutional provisions in mind, we turn to the Civil Service Rules to determine the process that the City of

New Orleans has adopted for permanent appointments bearing in mind that the Civil Service Rules "must be recognized and enforced by the courts unless they violate basic constitutional rights or are unreasonable." *Reimer*, 1995-2799, p. 4, 688 So.2d at 168 (citing *Rocque v. Dep't of Health & Human Res.*, 505 So.2d 726, 728 (La.1987)).

The delegation under which Mr. McClendon argues SWBNO had authority to set and evaluate the minimum qualifications for the UHRA position is found in City Civil Service Rule VI, which pertains to "Vacancies, Certification & Appointment." The preamble to Rule VI states, in pertinent part that "[t]he purpose of this Rule is to ensure the efficient screening and assessment of applicants for promotion and appointment under a general system based on merit, efficiency, fitness and length of service as ascertained by examination which, so far as practical, shall be competitive." The preamble further provides that "the Commission may delegate certain hiring authorities to individual appointing authorities" but that "the Commission shall first adopt a pilot program that will provide for delegation only to [SWBNO]."

Despite this delegation of certain hiring authorities, Rule VI further states that "the determination as to whether an applicant meets Minimum Qualifications may be done by the Civil Service Department, or by an appointing authority under delegated authority granted by the Commission" but "[d]ecisions made by the appointing authority may be reviewed by the Director and his/her decisions will be final." Civil Service Rule VI, §3.2. When questioned about the delegation of authority to SWBNO, Ms. Trepagnier clarified that this did not change the way the Civil Service Department handled minimum qualifications. She specified that there were no amendments to the Civil Service Rules regarding minimum qualifications

in light of the delegation. Rather, Ms. Trepagnier testified that the delegation allowed SWBNO to perform certain tasks that are normally the responsibility of Civil Service staff, such as vetting applications for positions, creating an eligible list of candidates, and certifying that eligible list of candidates. Further, according to Ms. Trepagnier, minimum qualifications relate to the enforcement of the uniform classification and compensation plan, which cannot be delegated because that enforcement is part of Civil Service's exclusive constitutional authority under Article 10.

> Additionally, Section 3.3 of Civil Service Rule VI states:
>
> Appointees must meet the Minimum Qualifications for the job. The Director may order the dismissal or demotion of any employee in the classified service who does not meet the Minimum Qualifications for his or her position. The failure of a regular employee to possess the minimum qualifications for the position to which he/she has been appointed is sufficient cause for that employee's dismissal or demotion.

Civil Service Rule VI, §3.3(a). Therefore, even in the case of a delegation of authority, Section 3.3(a) gives the Civil Service Director the authority to order the dismissal or demotion of a probationary employee who does not meet the minimum qualifications of the job. Reading Sections 3.2 and 3.3 of Civil Service Rule VI in conjunction with each other, we conclude that the Civil Service Director has the authority to determine the minimum qualifications that applicants must possess to become candidates for a civil service position and also has the authority to order the dismissal of a probationary employee who does not meet the minimum qualifications that the Director previously determined. Based on our review of Rule VI, we agree with Ms. Trepagnier's testimony that even in instances in which the Civil Service Department has delegated some hiring

authority, the Civil Service Department retains the power to be the final arbiter of whether minimum qualifications have been met by an applicant.

We further note that in Mr. McClendon's case, the dispute as to whether Mr. McClendon met the minimum qualifications did not arise until he approached the end of his probationary period. To this end, we find Civil Service Rule V is also applicable to Mr. McClendon's situation. It provides, in pertinent part:

> The Personnel Director shall fix minimum qualifications for training, residence, age, health, skill, education, or other qualifications for admission to examination for each class. *Such qualifications must be possessed by any applicant by the final filing date for each examination unless otherwise specified on the official announcement.* The Personnel Director shall seek appointing authority input into establishing the minimum qualifications and form of examination.

Civil Service Rule 5, § 2.4 (emphasis added). The Civil Service Personnel Director has the final say on whether an applicant possesses the minimum qualifications for a position and also whether one possesses the minimum qualifications by the date listed on the job announcement to remain in that position. In the matter *sub judice*, the UHRA job posting stated that a professional certification was "preferred but not required" for candidates for the position but further provided that, if appointed to the UHRA position, the professional certification had to be obtained during the one-year probationary period. No one disputes that Mr. McClendon met the minimum qualifications to be a candidate for the UHRA position and to fill that position, but the issue was whether he had the minimum qualifications to *remain* in the job. Mr. McClendon met the minimum qualifications for hiring (because a professional certification was not required to start in the UHRA position); but, as Ms. Trepagnier determined, under the authority vested in her by Civil Service Rule V, §2.4, Mr. McClendon did not meet the minimum qualifications for remaining in the position because he did not obtain

35

the professional certification during his two and a half years on the job, thus exceeding the one-year timeframe provided in the job posting for obtaining the certification.

Considering the exclusive rulemaking authority vested by the Louisiana Constitution in the Commission for setting qualifications and the foregoing Civil Service Rules which place the final decision as to whether an employee has met the minimum qualifications for a position with the Civil Service Director, we find no merit to Mr. McClendon's first assignment of error. The Commission did not err in finding that Civil Service is the sole determinative body regarding the minimum qualifications for SWBNO positions despite delegation in 2016 because the Civil Service Director retains the final say regarding minimum qualifications even in cases of delegation of some hiring authority.

***Assignment of Error Number Two***

### **Whether Mr. McClendon Was a Permanent Employee**

In his second assignment of error, Mr. McClendon contends that the "Commission erred in finding that [he] was not a permanent employee." In support of his position, Mr. McClendon asserts that his hire date was November 16, 2019, which made the end of his probationary or working test period November 16, 2020. Focusing on that November 16 date, Mr. McClendon contends that "[b]ecause the effective date of the transfer to 'Transient' status is the same day as the end of his 'working test' period and [Mr.] McClendon was not terminated on November 16, 2020, [Mr.] McClendon should be found to have completed his probationary/working test period and by operation of law became a permanent

employee under Civil Service Rule VII, Section 1.4.[19]" In response, SWBNO contends that Mr. McClendon's hire date was November 18, 2019. SWBNO also counters that permanent status cannot be acquired by accident, such that the mere passage of one year's time was insufficient to confer permanent status on Mr. McClendon in light of him not meeting the minimum requirements.

Civil Service Rule VII pertains to "Working Tests," and it provides, in pertinent part, that "[e]very person appointed to a position in the classified service after certification of his name from an original entrance employment list or a promotion list, shall be tested by a working test while occupying the position." Civil Service Rule VII, § 1.1. However, Civil Service Rule VII does not specify on what date an employee's working test period begins. Louisiana Revised Statutes 33:2417 is found in Title 33 of the Revised Statutes (Municipalities and Parishes), Chapter 5 (Civil Service), Part I (Civil Service for Cities of over 100,000 population).[20] It states that "[t]he period of the working test shall commence

---

[19] Mr. McClendon cites Civil Service Rule VII, § 1.4 in his Appellant Brief for the proposition that "[p]robationary appointments that begin or are extended on or after February 1, 1994, and were completed without the probationary appointment being terminated by the appointing authority, shall have become permanent effective April 25, 1996." Civil Service Rule VII, § 1.4 states:

> Failure by an appointing authority to give the ten (10) days prior written notice to the Personnel Director and a copy thereof to the employee shall have the same force and effect as a satisfactory report. Probationary appointments that begin or were extended on or after February 1, 1994, and were completed without the probationary appointment being terminated by the appointing authority, shall become permanent effective April 25, 1996.

[20] We take judicial notice of the website of the United States Census Bureau, which establishes that the population of New Orleans is greater than 100,000. Accordingly, La. R.S. 33:2417, which applies to civil service in cities with a population of over 100,000 residents, applies in this case. *QuickFacts: New Orleans city, Louisiana*, UNITED STATES CENSUS BUREAU,

immediately upon appointment and shall continue for the time, not less than six months nor more than one year, established by the director subject to the rules." La. R.S. 33:2417.

In determining the start of the plaintiff firefighter's working test period in *Babers v. City of Shreveport*, the Louisiana Second Circuit Court of Appeal ("Second Circuit") disagreed with the plaintiff's contention that his "working test period began immediately upon the date of his employment on August 16, 1990." 621 So.2d 88, 90 (La. App. 2d Cir. 1993). The Second Circuit analogized the start date of the working test period to the commencement of prescription and explained:

> Both [La.] C.C. [a]rt. 3454[21] and [La.] C.C.P. [a]rt. 5059[22] provide[] that the day of commencement is not counted in computing prescription. Although [La.] R.S. 33:2495[23] states that the period of the working test commences immediately upon appointment, this statute does not create an exception to the general rule found in

---

https://www.census.gov/quickfacts/fact/table/neworleanscitylouisiana/PST045223 (last visited Feb. 27, 2024).

[21] Louisiana Civil Code Article 3454 states:

> In computing a prescriptive period, the day that marks the commencement of prescription is not counted. Prescription accrues upon the expiration of the last day of the prescriptive period, and if that day is a legal holiday, prescription accrues upon the expiration of the next day that is not a legal holiday.

[22] Louisiana Code of Civil Procedure Article 5059(A) states that "[i]n computing a period of time allowed or prescribed by law or by order of court, the date of the act, event, or default after which the period begins to run is not to be included."

[23] Louisiana Revised Statutes 33:2495 is found in Title 33 of the Revised Statutes (Municipalities and Parishes), Chapter 5 (Civil Service), Part II (Fire and Police Civil Service Law for Municipalities Between 13,000 and 250,000). Though La. R.S. 33:2495 applies to fire and police service, like La. R.S. 33:2417, it provides, in pertinent part, for a working test period to "commence immediately upon appointment." Therefore, we find the reasoning employed by the Second Circuit in *Babers* to be analogous to the matter *sub judice*.

articles 3454 and 5059. Moreover, [La.] C.C. [a]rt. 1784 provides that if the term for performance of an obligation is marked by a period of time (as opposed to a specific date), then the term begins to run on the date after the contract is made or on the day after the occurrence of events that marks the beginning of the term. Applying this codal principle to the instant facts, the prescriptive period of 12 months began on August 17, 1990 the day after his appointment. Termination on August 16, 1991 effective August 15, 1991 was within the period. This contention is without merit.

*Id.* Thus, the Second Circuit concluded that the first day of the working test period is the day after one's appointment to a position in the civil service, not on the actual date of appointment. *Id.* In *Terry v. Dep't of Police*, this Court explained that the "[t]he one-year working test period . . . is the period when the Appointing Authority can observe [an employee's] on-the-job performance of his duties or work in the field." 2008-1436, p. 6 (La. App. 4 Cir. 10/7/09), 23 So.3d 974, 978 (citing *Banks v. New Orleans Police Dep't*, 2001-0859, 2001-1302, p. 6 (La. App. 4 Cir. 9/25/02), 829 So.2d 511, 516. Thus, "[t]he working test period does not take place until the [employee] is working on the job . . . ." *Terry*, 2008-1436, p. 6, 23 So.3d at 978 (quoting *Banks*, 2001-0859, 2001-1302, p. 6, 829 So.2d 511 at 516). That is, the purpose of the working test period is to provide the appointing authority with the ability and opportunity to evaluate the employee's performance, which is impossible until the employee actually begins working. If an employee is demoted or terminated prior to the end of their working test period, then the employee is not a regular employee and has no right to a general disciplinary appeal of his or her demotion or termination. *Moton v. Sewerage & Water Bd. of New Orleans*, 2022-0747, p. 9 (La. App. 4 Cir. 5/20/23), 368 So.3d 151, 157.

With these principles in mind, we turn to the facts and dates of the matter *sub judice*. As previously stated, Mr. McClendon contends that his "hire date was November 16, 2019," and that this triggered the start of his probationary period.

The Commission stated in its decision that Mr. McClendon began his employment with SWBNO in the UHRA position on November 18, 2019. This finding by the Commission is supported by Mr. McClendon's own testimony that his start date was "November 17th [or] 18[th] of 2019, whatever that Monday [was]." We take judicial notice that the Monday of that week was November 18, 2019.[24] Based on the analysis in *Babers* and *Terry*, Monday, November 18, 2019, was the beginning of SWBNO's ability to observe Mr. McClendon's on-the-job performance and constituted the start of his working test period, not November 16, 2019, as Mr. McClendon alleges. Therefore, the last day of Mr. McClendon's working test period was November 17, 2020, not November 16, 2020, as Mr. McClendon alleges. In fact, this timeline is even supported by one of Mr. McClendon's own pieces of evidence, Appellant Exhibit 8: the Employee Extra Fields lists Mr. McClendon's Probationary start date as November 18, 2019, and his probationary end date as November 17, 2020. These conclusions are also supported by Ms. Trepagnier's description of the working test period as "the timeframe that the department has to assess a new hire." Thus, we disagree with Mr. McClendon's calculation that his transfer to transient status was the same day as the end of his working test period. Rather, the Requisition Form that transferred Mr. McClendon to transient status has an effective date of November 16, 2020, which is before the end date of Mr. McClendon's working test period, November 17, 2020. Based on the facts, we find SWBNO's transfer of Mr. McClenon to transient status was effective and occurred prior to the end of his working test period. Mr. McClendon never completed his working test period to become a permanent employee, so the

_____

[24] *See* La. C.E. art. 201.

Commission correctly concluded that Mr. McClendon had no right to a general disciplinary appeal. *Moton*, 2022-0747, p. 9, 368 So.3d at 157.

Moreover, we agree with SWBNO that one cannot become a permanent civil service employee by accident. As explained by this Court in *Owen v. New Orleans City Civil Service Commission*, "[p]ermanent appointment to the Civil Service cannot be acquired by accident or by estoppel, or by any means other than that which is prescribed by the Constitution." 371 So.2d 364, 366 (La. App. 4th Cir. 1979). An objective of the civil service rules is to prevent a person from "occupying a position for which [he or] she is not qualified and for which [he or] she has never taken the steps required by law and, in effect, has prevented someone else who is qualified and who has taken the necessary constitutional, statutory and regulatory examinations from taking [his or] her position." *Id.* In *Owen*, this Court considered a situation in which the subject appointing authority dismissed the plaintiff employee after she served a series of successive temporary appointments over the course of five and a half years "and concluded that her situation had somehow provided her with permanent status." *Id.* The trial court agreed with the plaintiff's conclusion; but, in disagreeing with the plaintiff's position, this Court observed that "[t]he entire scheme of Civil Service or the merit system for public employment is to insure that permanent appointments are obtained on merit, i.e., on the basis of competitive examinations," such that "[w]hen the Civil Service employee obtains permanent status that employee becomes a part of a unique system with job security guaranteed by the Constitution itself." *Id.* The Court further explained that "the trial judge . . . used his equitable powers to confer on the plaintiff the status of one who has received a permanent appointment to the Civil Service notwithstanding the fact that she has never attained that status in

41

accordance with the Constitution and the rules of the Commission." *Id.* In sum, the mere passage of time did not confer permanent status on the plaintiff because she had not achieved permanent status in the manner prescribed by the Civil Service Rules on the basis of merit and competitive examination.

Mr. McClendon raises many of the same arguments as the plaintiff in *Owens*, including the assertion that the passage of time can confer permanency. To so hold would thwart the objective of civil service to create a uniform system of classification based on merit and competitive examination. *New Orleans Firefighters Ass'n Local 632*, 590 So.2d at 1176. Also like the plaintiff in *Owen*, we find that Mr. McClendon did not reach permanent status in accordance with the Civil Service Rules because SWBNO moved him to transient status before the end of his one-year working test period. Thus, Mr. McClendon never completed the one-year working test period as required by Civil Service Rule VII to become a permanent or regular employee.

Mr. McClendon's second assignment of error is without merit, and the Commission did not err in finding that Mr. McClendon was not a permanent employee. Per the Requisition Form, Mr. McClendon's transfer to transient status was effective on November 16, 2020, which was before the end of his probationary period on November 17, 2020; so he never completed the working test period to become a permanent employee as required by Rule VII. Accordingly, he had no right to a general disciplinary appeal. Further, Mr. McClendon is incorrect in asserting that a civil service employee passes the working test period and becomes permanent based on the mere passage of time if the employee has no right to remain in the position because they have not followed the process outlined in the Civil Service Rules for attaining permanent status.

*Assignment of Error Number Three*

### The Effectiveness of the Transfer to Transient Status

In his third assignment of error, Mr. McClendon asserts that the "Commission erred in finding that the transfer to 'Transient' status was effective before the probationary period ended." Mr. McClendon argues that he "was improperly removed in violation of Civil Service Rules," thereby "rendering the transfer ineffective and giving him permanent status by operation of law." In particular, he contends that the transfer was improper because it violated Civil Service Rule VII, § 1.1 for two reasons. Mr. McClendon asserts that under Civil Service Rule VII, § 1.1, SWBNO could only remove him after the first two months of his working test period if his working test indicated that he was unable or unwilling to perform his duties satisfactorily or that his habits and dependability did not merit his continuance in the service. Mr. McClendon argues that his performance evaluations demonstrate that neither of these circumstances was true. Second, Mr. McClendon argues that the transfer to transient status was ineffective because Civil Service Rule VII, § 1.1 required the Civil Service Director to provide him with notice and an opportunity to be heard prior to his removal. To address this assignment of error, we must consider whether, as alleged by Mr. McClendon, Civil Service Rule VII applied to his situation and, if so, whether its mandates were followed.

Civil Service Rule VII pertains to "Working Tests" and provides, in pertinent part:

> Every person appointed to a position in the classified service after certification of his name from an original entrance employment list or a promotion list, shall be tested by a working test while occupying the position. At any time during his working test period, after the first two months thereof, the appointing authority may remove an employee if,

43

in the opinion of the appointing authority, the working test indicates that (1) the employee is unable or unwilling to perform his duties satisfactorily or (2) his habits and dependability do not merit his continuance in the service; provided not more than three (3) employees shall be removed successively from the same position. Upon the removal, the appointing authority shall forthwith report to the Director and to the employee removed his action and the reason therefore. The appointing authority may remove an employee within the first two months of this working test period only with the approval of the Director. The Director may remove an employee during his working test period if he finds, after giving him notice and an opportunity to be heard, that the employee was appointed as a result of fraud or error.

Civil Service Rule VII, § 1.1. The Civil Service Rules about transient status are contained in a different rule, Rule VI, which pertains to "Vacancies, Certification & Appointment." That rule defines transient appointments as occurring "[w]henever the services of an extra or substitute employee are needed in any position in the classified service for a period of less than three months . . . ." Civil Service Rule VI, 5.3(b). The rule further states that "the appointing authority, with the prior approval of the Director, may make a transient appointment of any person he deems qualified to serve for the period required." Additionally, the Civil Service Rules define "Transfer" as "the change of an employee from a position in one organization unit to a position in another organization unit in the same classification; see also 'Lateral Classification Change.'" Civil Service Rule I, § 1(78). As referenced therein, "Lateral Classification Change" is defined as "the change of an employee from a position in one classification to one in another classification at the same pay grade for which the employee is qualified." Civil Service Rule I, § 1(40).

As Mr. McClendon correctly observes in his brief to this Court, the Civil Service Rules do not define the terms "remove" or "removal" as used in Civil Service Rule VII, § 1.1. In discussing the Civil Service Rules, however, the

Louisiana Supreme Court has explained that the procedural requirements of Civil Service Rule VII, § 1.1 do not apply in all instances. In *Bell v. Dep't of Health & Human Resources*, the Civil Service Director informed the plaintiffs by letter that they were reallocated from one position to another (from the position of equipment operator I to the position of labor-utility), and the plaintiffs appealed the reallocation to the Civil Service Director, who affirmed the reallocation. 483 So.2d 945, 946-47 (La. 1986). In appealing to the Commission, the plaintiffs alleged, in part, that the reallocation was improper because they were demoted without cause and because the procedures used to enact their reallocation violated their due process right to notice and opportunity. *Id.*, 483 So.2d at 947. In their appeal to the Louisiana Supreme Court, the plaintiffs argued that their reallocation was equivalent to a demotion and thus entitled them to the same procedural protections, but the Louisiana Supreme Court disagreed because it is "the substantive nature of the action, rather than its definition, which is controlling." *Id.*, 483 So.2d at 948. To this end, the Louisiana Supreme Court explained that although "a reallocation by definition is a demotion,"[25] a reallocation differs from a demotion because it is not a disciplinary sanction and the Civil Service Director's recommendation of a reallocation in that case was not dependent on the job performance of the plaintiffs but upon "an analysis of the duties performed (as distinguished from the competency of the performance." *Id.* The Louisiana Supreme Court concluded that because "[p]rocedural due process concerns are lessened in a reallocation situation

---

[25] The Louisiana Supreme Court provided the definition of "reallocation" from the applicable civil service rules as "a change in the allocation of a position from one class to another class wherein the duties of the position have undergone a change." *Bell*, 483 So.2d at 948. Additionally, the Louisiana Supreme Court stated that a "demotion" was "a change of a permanent or probationary employee from a position of one class to a position of another class for which a lower minimum rate of pay is prescribed." *Id.*

as opposed to a disciplinary action," an employee who is reallocated is not entitled to the same procedures as an employee who is demoted. *Id.*, 483 So.2d at 950.[26]

Similar to the plaintiffs in *Bell*, Mr. McClendon argues that he was transferred to transient status without cause and without notice and opportunity in violation of Civil Service Rule VII, § 1.1. We disagree with Mr. McClendon that the procedural protections of Civil Service Rule VII, § 1.1 applied to his unique situation. As the Louisiana Supreme Court explained in *Bell*, it is "the substantive nature of the action, rather than its definition, which is controlling," and, in the matter *sub judice*, the substantive nature of the transfer to transient status was to afford Mr. McClendon with additional time to obtain his professional certification, which he was required to have to remain in the UHRA position past the one-year probationary period. In fact, the record reveals that Mr. McClendon understood that additional time, not a disciplinary reason, was the basis for his transfer to transient status. During the March 23, 2023 hearing, Mr. McClendon agreed when Mr. Ginsberg asked him if he understood that the purpose of his transfer to transient status was to give him additional time to get the certification. We agree with Mr. McClendon that his evaluations demonstrate that Mr. Callahan was pleased with his performance; but, like in *Bell*, the transfer to transient status was not conditioned on Mr. McClendon's job performance or his competency. Moreover, Ms. Trepagnier agreed that during his time in transient status, Mr. McClendon's working test period merely paused by his placement in transient and then provisional status and that he otherwise "was the same employee working in

_____

[26] We note that the Louisiana Supreme Court decided *Bell* based on different civil service rules and focused on constitutional procedural protections. Nonetheless, because the arguments and issues decided in *Bell* are similar to Mr. McClendon's situation, we find the Louisiana Supreme Court's analysis and reasoning to be applicable to the matter *sub judice*.

the same job" and at "the same classification." Thus, Mr. McClendon actually remained in his same position unlike the plaintiffs in *Bell*. Considering the nature and substance of Mr. McClendon's transfer to transient status, we conclude that Mr. McClendon was not entitled to the procedures outlined in Civil Service Rule VII, § 1.1, which more appropriately apply to an employee who is demoted to a different position within civil service or removed from the civil service entirely based on poor job performance before the end of their working test period. Unlike those situations, Mr. McClendon's transfer to transient status was actually designed to benefit and help him by allowing him to stay in his position and the transfer, in fact, afforded him an additional year and a half in his position and extra time to try to obtain the professional certification.

Mr. McClendon's third assignment of error is without merit because Civil Service Rule VII, § 1.1 did not apply to his transfer to transient status, which SWBNO enacted merely as a benefit to Mr. McClendon to give him additional time beyond his one-year working test period to obtain the mandatory professional certification. Accordingly, the Commission did not manifestly err in finding that Mr. McClendon's transfer to transient status was effective.

***Assignment of Error Four***

## <u>Whether the Letter Conveyed Permanent Status</u>

In his fourth assignment of error, Mr. McClendon asserts that the "Commission erred in finding that the letter issued by . . . SWB[NO] notifying [Mr.] McClendon of his permanent status was ineffective." In this assignment of error, Mr. McClendon argues that he "received effective notice by SWB[NO] that he was permanent" in the form of the November 6, 2020 letter signed by Ms.

Boatman. Mr. McClendon contends that the letter was effective in granting him permanent status because

> 1) it was issued prior to any effective date or hire date transferring McClendon to "Transient" status 2) it was a determination by the appointing authority in accordance with their procedures and 3) according to the appointing authority, [Mr.] McClendon did not need to meet the certification requirement because [Mr.] Callahan stated that he did not authorize the "Note" section requiring certification within a year and maintained that the certification was preferred but not required.

In countering Mr. McClendon's fourth assignment of error, SWBNO argues that the November 6, 2020 letter signed by Ms. Boatman was without effect and did not confer permanent status on Mr. McClendon. In particular, SWBNO points to Ms. Trepagnier's testimony that the letter came after the discussions about placing Mr. McClendon in transient status. SWBNO also notes Ms. Trepagnier's testimony that the letter was "null and void" because Mr. McClendon had not met the minimum requirements of his position. Additionally, SWBNO points to Ms. Trepagnier's testimony that Ms. Boatman did not have appointing authority to grant permanent status and that Mr. Korban was the appointing authority for SWBNO. SWBNO also reiterates its prior argument that permanent appointment to the civil service cannot be acquired by accident.

First we address Mr. McClendon's contention that the letter was a determination by the appointing authority in accordance with their procedures. The November 6, 2020 letter signed by Ms. Boatman stated that Mr. McClendon had satisfied his probationary period. However, as previously discussed, the ultimate determination as to whether an employee meets the minimum qualifications for his or her position rests with the Civil Service Director. Civil Service Rule VI, § 3.3. Contrary to the contents of the letter, Ms. Trepagnier determined that Mr.

McClendon was not going to satisfy his working test period because the end date was approaching and he did not have his professional certification. Accordingly, we agree with the Commission's conclusion that the decision about whether Mr. McClendon met the minimum qualifications for the position of [UHRA] rested with Ms. Trepagnier as the Director of Personnel and that those at SWBNO "lacked the authority to grant permanent status to Mr. McClendon when, in the Director of Personnel's opinion, he had not met the minimum qualifications for the position." Beyond finding that Ms. Trepagnier had final authority as to whether Mr. McClendon satisfied the probationary period, we point to Mr. Callahan's testimony about the letter, which supports a conclusion that even SWBNO's internal procedures for notifying an employee about permanent status were not followed. Mr. Callahan stated, "I [do not] have any recollection of that letter, other than knowledge of it after the fact, later after the fact. . . . I [do not] have any knowledge of how that . . . occurred. That [did not] make any sense to me, honestly." When asked whether the letter provided Mr. McClendon with permanent status, Mr. Callahan responded, "I [do not] believe it did" and that "it [did not] seem to [him] like the procedure was followed correctly here" because he did not recall being notified in advance as he should have been.

Second, while Mr. McClendon contends that the letter was issued prior to any effective date transferring him to "transient" status, the issue date of the letter is *after* Ms. Trepagnier and SWBNO had already determined that Mr. McClendon needed to be placed in transient status due to his lack of professional certification as the end of the working test period approached. Thus, the action taken by Ms. Boatman in issuing and signing that letter was contrary to the determinations made by those superior to her, Ms. Trepagnier, Mr. Korban, and Mr. Callahan. The

effective date of Mr. McClendon's transfer to transient status per the Requisition Form was November 16, 2020. Yet, the letter purported that Mr. McClendon would become permanent on November 17, 2020. Thus, by the time Mr. McClendon would have become permanent according to the letter, those superior to Ms. Boatman at SWBNO had already transferred him to transient status.

Third, we disagree with Mr. McClendon's categorization that "according to the appointing authority, [he] did not need to meet the certification requirement because [Mr.] Callahan stated that he did not authorize the 'Note' section requiring certification within a year and maintained that the certification was preferred but not required." Contrary to how Mr. McClendon summarizes this, we note that when asked whether it was his intent to require professional certification for the UHRA job posting, Mr. Callahan responded, "Well, as clearly indicated in the email exchange at the time, yes." He clarified that there had been back and forth discussions about whether to include the professional certification as a requirement, such that by the time SWBNO learned in July 2020 that Mr. McClendon needed the professional certification, Mr. Callahan had simply forgotten that he had ultimately decided to include it. We also point again to Ms. Trepagnier's testimony and our prior conclusion that the Civil Service Director has the final say on minimum qualifications.

Finally, we agree once again with SWBNO that one cannot become a permanent employee in the civil service system by accident. We recall Ms. Segura's explanation about the process for issuing letters like the November 6, 2020 letter signed by Ms. Boatman. She explained that a clerical employee monitored the status of probationary employees and informed their supervisors as the end of the probationary period approached. According to Ms. Segura, after the

50

clerical employee so notifies the supervisor, the supervisor has to respond if he or she seeks to extend the probationary period. If the supervisor does not respond, as Ms. Segura explained, the clerical employee then types up the permanent status letter and gives it to the employee. Mr. Callahan did not recall receiving notice in advance of the letter, which he explained would have been the proper procedure. Mr. McClendon did not offer any proof that Mr. Callahan received notice in advance of the letter. Thus, it is unclear if someone sent notice to Mr. Callahan, and he missed it, or if no one sent notice to Mr. Callahan. Regardless, for us to conclude that the letter conveyed permanent status on Mr. McClendon without proof that SWBNO's internal procedure was followed would be tantamount to concluding that Mr. McClendon became permanent by accident.

Therefore, the Commission did not manifestly err in concluding that the letter signed by Ms. Boatman notifying Mr. McClendon of his permanent status was ineffective. Mr. McClendon's fourth assignment of error is without merit.

### Assignment of Error Number Five

### Evidentiary Rulings

In light of our foregoing conclusions regarding Mr. McClendon's first, second, third, and fourth assignments of error, we find it unnecessary to discuss his fifth assignment of error and pretermit discussion of same. The law and evidence in the record support the Commission's conclusion that Mr. McClendon did not have a right to appeal his termination because he never became a permanent employee.

### DECREE

For the foregoing reasons, we affirm the Commission's May 11, 2023 decision, which found that Mr. McClendon never met the minimum qualifications

for the UHRA position at SWBNO; was never a permanent employee because he did not meet the minimum qualifications; and did not have a right to appeal to the Commission because he was not a permanent employee.

**AFFIRMED**